**John BALL, Plaintiff-Appellee,**

v.

**OVERTON SQUARE, INC.,**
**Defendant-Appellant,**

and

**David BROYLES, Plaintiff-Appellee,**

v.

**OVERTON SQUARE, INC.,**
**Defendant-Appellant.**

Court of Appeals of Tennessee,
Western Section, at Jackson.

Jan. 20, 1987.

Permission to Appeal Denied by
Supreme Court June 1, 1987.

J.N. Raines & Randall B. Womack, Glankler, Brown, Gilliland, Chase Robinson & Raines, Memphis, for defendant-appellant.

Charles Merkel & John Cocke, Merkel & Cocke, Clarksdale, Miss., Ben Todd, Todd & Deal, Memphis, for plaintiffs-appellees.

HIGHERS, Judge.

This appeal arises from a dispute between the defendant, Overton Square, Inc. (OSI), and the plaintiffs, John Ball and David Broyles, two of the defendant's former employees.

Ball and Broyles were vice-presidents of OSI when their employment was terminated in June of 1983. Subsequently, both filed virtually identical complaints against OSI, alleging various causes of action. Only the allegations pertinent to this appeal will be discussed here.

In Count I of the complaint, it was alleged that OSI's dismissal of the plaintiffs constituted a breach of express and implied employment contracts. Count III alleged that the plaintiffs were each entitled to $42,750 under the Overton Square, Inc. Performance Share Plan, or "shadow stock" plan. Counts IV and V alleged that the defendant committed trespass and conversion when it had the plaintiffs' automobiles repossessed.

The consolidated cases went to trial before a jury in December 1985. After the close of the defendant's proof, the trial court directed a verdict in favor of the plaintiffs on the "shadow stock" issue, ruling that each was entitled to $42,721.50, plus $10,953.37 in pre-judgment interest. The trial court also ruled that the defendant had committed trespass as a matter of law, leaving the jury to determine the amount of damages.

The jury returned a verdict in favor of the plaintiffs on the issue of employment contracts, finding that express and implied employment contracts existed and were breached by OSI, entitling each of the plaintiffs to $16,000 in compensatory damages. No damages were awarded for the trespass, but the jury found that a conversion had occurred, for which it awarded each plaintiff $600 in compensatory damages. The jury also assessed punitive damages against OSI for the conversion, in the amount of $50,000 for each plaintiff. The punitive damage award was subsequently remitted by the trial court to $25,000 for each plaintiff.

## I. EMPLOYMENT CONTRACTS

It was asserted at trial that each plaintiff had an express, although admittedly oral, contract of employment with OSI that ran from January 1 through December 31 of each year, including 1983. The jury found that such an express contract was in effect for 1983. We find no material evidence in the record to support that finding.

■ The plaintiffs testified that they felt obligated to remain with OSI through December of each year, and that they had a new express contract beginning each January 1. However, the annual salary reviews, which the plaintiffs assert were contract negotiations, typically did not take place until January or February, and in 1983 did not occur until early April. The plaintiffs were never told by anyone at OSI that they had a one year contract for 1983. Therefore, no express contract could have been formed in January 1983.

■ On the issue of implied contracts, OSI contends that the trial court erroneously instructed the jury that "a hiring of so much per week or month or year is a hiring for that period, provided there are no circumstances to the contrary ..." This contention of the defendant is clearly wrong. The trial court's instruction was correct; it is taken almost verbatim from *Delzell v. Pope*, 200 Tenn. 641, 294 S.W.2d 690 (1956), in which our Supreme Court set forth the rule in Tennessee, that a hiring at so much per period, is a hiring for that period, provided there are no circumstances to the contrary. *Id.*, 294 S.W.2d at 694. *See also Ward v. Berry & Associates, Inc.*, 614 S.W.2d 372 (Tenn.App.1981).

■ As the trial court's instruction was correct, there is clearly material evidence in the record supporting the jury's finding of implied employment contracts. In the 1970's, the plaintiffs were promoted to management positions within OSI, and their salaries were fixed and communicated to them on an annual basis. When reviewed each year, the salaries were made retroactive to January 1, and covered the period through December 31. This practice continued throughout the many years the plaintiffs were employed with OSI. In 1983, the parties agreed in April that each of the plaintiffs would receive, retroactive to January 1, a salary of $51,321.29, plus a potential bonus of $1,993.99. This is sufficient evidence for the jury to find that the employment was for a definite period, and not terminable at will.

■ OSI also argues that the "shadow stock" plan contains a clause which establishes that no employment contracts existed. The clause reads as follows:

> Nothing in the Plan or in any performance shares awarded or in any agreement with respect thereto entered into pursuant to the Plan shall confer upon any employee any right to continue in the employ of the Corporation or of any of its subsidiaries, or interfere in any way with the right of the Corporation or any such subsidiary to terminate such employee's employment at any time.

This clause states only that the Plan, of itself, does not confer any right to continued employment. In the absence of specific language to the contrary, the Plan cannot be construed to take away any such rights which might exist independently of it.

## II. PUNITIVE DAMAGES

The jury assessed punitive damages against OSI in the amount of $50,000 for each plaintiff, for the conversion of the plaintiffs' automobiles. The trial court reduced that amount to $25,000 each. The defendant contends that even after the remittitur, the award is excessive. The plaintiffs assert that the original $50,000 award was reasonable, and the remittitur was therefore improper.

The plaintiffs rely on *Coppinger Color Lab, Inc. v. Nixon*, 698 S.W.2d 72 (Tenn. 1985), for their assertion that the rule for testing the excessiveness of the punitive damage award in this case is that the award should be set aside "if it is grossly excessive or appears to be the result of passion, prejudice, improper sympathy, or for some other reason appears to constitute an injustice," *Id.*, at 75. In *Coppinger*, however, the jury verdict was approved by

the trial judge, while in the present case the trial judge exercised the power of remittitur. It is well established that while the amount of damages is primarily for the jury to determine, the trial judge who heard the evidence is the next most competent person to decide the question. *Burlison v. Rose*, 701 S.W.2d 609 (Tenn.1985). Thus this Court must review the action of the trial judge.

The standard of review for additurs and remittiturs is set forth in *Burlison, supra.* An appellate court, in reviewing a remittitur, must ascertain whether the trial judge's action was justified, giving due credit to the jury's assessment of the credibility of the witnesses and to the trial judge in his capacity as thirteenth juror. *Burlison, supra*, at 611.

In reviewing the record, we find that the evidence justifies reducing the punitive damage award. The factors to be considered include the nature of the acts, the amount of compensatory damages awarded, and the wealth of the particular defendant. *Coppinger*, 698 S.W.2d at 75.

The parties have stipulated that the net worth of OSI is $1,250,000. However, the jury awarded only $600 in compensatory damages for the conversion, since the plaintiffs were without their automobiles for only three weeks. Therefore, the determining factor is the nature of OSI's conduct.

■ David Halle, who was president of OSI, ordered the repossession of the plaintiffs' automobiles. It is clear from the record that Halle knew, and chose to ignore the fact that the automobiles in question belonged to the plaintiffs and not to OSI. The conversions were accomplished, however, with no breach of the peace. There was a disturbance when the individual hired by Halle first attempted to pick up Broyles' car; however, trespass could not be the basis of the punitive damage award since the jury did not award actual, compensatory damages, a prerequisite to punitive damages. *See, Liberty Mutual Insurance Co. v. Stevenson*, 212 Tenn. 178, 368 S.W.2d 760 (1963); *Cullum & Maxey Camping Center, Inc. v. Adams*, 640 S.W.2d 22 (Tenn.App.1982); *Allen v. Melton*, 20 Tenn.App. 387, 99 S.W.2d 219 (1936).

The conduct of the defendant was not so oppressive as to warrant a $25,000 assessment of punitive damages. We are of the opinion that OSI should be assessed punitive damages in the amount of $15,000 for each of the plaintiffs, and the judgment will be modified accordingly.

### III. USE OF DEPOSITION

■ OSI contends that the trial court erroneously allowed the plaintiffs' counsel, over the objection of the defendant's counsel, to read portions of David Halle's discovery deposition. The defendant's contention is that when a witness is present and testifying, his deposition may not be used except for purposes of impeachment, and that the use of Halle's deposition was not proper impeachment.

Rule 32.01 of the Tennessee Rules of Civil Procedure provides:

(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness.

(2) The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, or managing agent, or a person designated under Rule 30.02(6) or 31.01 to testify on behalf of a public or private corporation ... which is a party may be used by an *adverse* party for *any* purpose. (Emphasis added)

The rule clearly provides that a party may use the deposition of an adverse party for any purpose. Halle was the president of OSI, whose testimony was taken by the plaintiffs' counsel as if it were cross-examination. In these circumstances, it was not error to allow portions of the deposition to be read, even though Halle was present and testifying at trial.

### IV. THE "SHADOW STOCK" PLAN

The OSI Performance Share Plan, or "shadow stock" plan, was designed as an incentive to officers and other managerial

employees of the corporation. Under the Plan, eligible employees were awarded performance "shares." These performance shares entitled the employee to receive a certain amount of money. At the time of their dismissal, Ball and Broyles each had received 475 performance shares.

The issue on appeal concerns the amount of money the performance shares entitle the plaintiffs to receive. The Plan has two provisions for determining the value of the shares. The alternate method is the one that is important in this appeal. It provides:

> However, should one person, partnership or corporation acquire seventy-five (75%) per cent of the common stock of the Corporation, or should the Corporation be liquidated, the performance share amount with respect to any performance share shall mean the average price per share paid by the acquirer in case of a sale or the amount received per share of common stock in liquidation.

The plaintiffs asserted at trial that 75% of the common stock of OSI had been transferred to OSI Investments, Inc. The trial court agreed and directed a verdict to that effect. The trial court's decision was based on the interpretation of the word "acquire" to mean "control" rather than legal title, and upon the finding that all of the incidences of ownership but for the actual stock certificates had been relinquished by OSI prior to the plaintiffs' dismissal in June of 1983.

We disagree with the trial court's ruling, and hold that 75% of the common stock of OSI had not been acquired by OSI Investments prior to the termination of the plaintiffs' employment. OSI Investments had not purchased, nor agreed to purchase, any of the Overton Square stock in June of 1983. It had only a stock purchase warrant for 6580 shares of treasury stock, and a "put" and "call" agreement coupled with an irrevocable proxy from Ben Woodson, a shareholder and director of OSI.

A stock purchase warrant is purely an option contract, entitling the holder to purchase a given number of shares of stock at a fixed price. It is a continuing offer to sell, typically long term. Such an option to purchase stock does not vest in the prospective purchaser an equitable title to, or any interest or right in the stock. *See Jones v. Horner*, 36 Tenn.App. 657, 260 S.W.2d 198 (1953); *Commissioner of Internal Revenue v. Smith*, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830 (1945); *Helvering v. San Joaquin Fruit & Investment Co.*, 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed. 824 (1936); *Pinney v. Tarpley*, 686 S.W.2d 574 (Tenn. App.1984).

In March or April, 1983, OSI Investments loaned money to OSI, in order to allow OSI to reacquire 7,942 of its shares from various shareholders. In Tennessee, a corporation is permitted to acquire its own shares, by statute. T.C.A. § 48–6–302. These treasury shares constitute unissued, non-outstanding shares that are not entitled to vote. T.C.A. §§ 48–6–103, 202 and 302. Therefore, when the 7,942 shares were reacquired by OSI, the number of outstanding shares was reduced from 14,474 to 6,532. The number of outstanding shares remained at 6,532 until OSI Investments exercised its stock purchase warrant on January 28, 1985.

The plaintiffs insist that because OSI Investments loaned OSI the money to reacquire the 7,942 shares, then received a stock purchase warrant for 6,580 shares at $1 per share, the transaction was a sham, designed to defraud them of their rights under the Performance Share Plan. No fraud was alleged in the complaint, however, and there is no evidence that OSI had any intention of circumventing the rights of the plaintiffs.

At the time of the plaintiffs' dismissal in June 1983, OSI Investments had an irrevocable proxy to 3,543 shares of stock owned by Ben Woodson. Even assuming that the proxy, combined with the "put" and "call" agreement, was sufficient to transfer that stock, OSI Investments would have acquired only 54.2% of the 6,532 shares outstanding at that time, far less than the 75% needed to trigger the alternate valuation provision of the Performance Share Plan. The plaintiffs will not

lose any rights under the Plan as a result of our holding; their performance shares will simply be valued in accordance with the primary valuation provision rather than the alternate provision.

The trial court, having ruled that 75% of the stock had been acquired, did not rule on the construction of the primary valuation provision. Therefore, the cause must be remanded to determine the amount to which the plaintiffs are entitled under that provision.

The order of judgment on the jury verdict is affirmed as to the judgment for breach of employment contract. The punitive damage award is modified to $15,000 for each plaintiff, and as modified, is affirmed. The directed verdict on the issue of the "shadow stock" plan is vacated, and the cause is remanded for a determination of the plaintiffs' rights under the primary valuation provision of that plan. Costs of the appeal are taxed one-half to the appellants, and one-half to the appellees.

TOMLIN, P.J. (W.S.), and FARMER, J., concur.