IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 2, 2003 Session

## ARMAND M. SALVATORE v. BARON CORPORATION, ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 141855-2     Daryl R. Fansler, Chancellor**

**FILED SEPTEMBER 23, 2003**

**No. E2002-01978-COA-R3-CV**

Following the termination of his employment, Armand M. Salvatore sued two corporations and six limited partnerships, as well as Miles E. Cullom, Jr., who was a stockholder, director, and president of the corporations, and who was also a limited partner in each of the limited partnerships, for salary, fees, and commissions allegedly due him under the terms of a written employment agreement. He also sued the defendant Cullom for statutory treble damages in tort for interference with his employment contract. Following a bench trial, the court below held that Salvatore, at the time of his termination, was employed under a renewed one-year employment contract. Pursuant to this holding, the trial court awarded him the remainder of his base salary for the second year of his employment. Salvatore appeals, contending that the trial court erred when it failed to award him salary for two additional years, fees, commissions, and treble damages. The defendants, on the other hand, claim that Salvatore is not entitled to the salary awarded to him by the trial court. We modify the trial court's judgment to increase Salvatore's award by $20,500. As modified, the judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., joined. HOUSTON M. GODDARD, P.J., not participating.

Joseph J. Levitt, Jr., Knoxville, Tennessee, for the appellant, Armand M. Salvatore.

R. Louis Crossley, Jr., Knoxville, Tennessee, for the appellees, Baron Corporation, CZ-Lebanon Associates, L.P., CZ-Bristol Associates I, L.P., CZ-Bristol Associates II, L.P., CZ-Lenoir City Associates, L.P., CZ-Brighton Associates, L.P., CZ-Morristown Associates, L.P., Cullom Properties, Inc. and Miles E. Cullom, Jr.

**OPINION**

I.

A.

Defendant Baron Corporation ("Baron") employed Salvatore as a construction manager for several projects. Baron is the general partner of each of the limited partnerships named as defendants in the complaint. Each limited partnership was formed for the purpose of commercially developing a particular tract of real estate. All of the limited partnerships have the same ownership makeup: 1% held by Baron as general partner and 49.5% by each of the limited partners, *i.e.*, the defendant Miles E. Cullom, Jr., and his business partner. The latter is not a party to this litigation. Salvatore's primary employment responsibility was to supervise the development and construction of the various commercial projects undertaken by Baron and/or one of the limited partnerships. The subject properties were either owned by one of the limited partnerships or by a third party with whom Baron had contracted for management responsibilities.

Both sides agree that Baron offered, and Salvatore accepted, the following employment contract, as set forth in a letter from Baron to Salvatore dated May 13, 1997:

> We are pleased to offer you this letter of employment. This should be an accurate recall of our discussions. However, feel free to call me with any questions and/or comment.
>
> 1. $1,500 every two weeks salary - $39,000/year
>
> 2. Construction Administration Fee:
>
>    1st  50,000 square feet - $.20 square foot
>    2nd  50,000 square feet - $.15 square foot
>    3rd  50,000 square feet - $.10 square foot
>    Over  150,000 square feet - $.05 square foot
>
>    * Payable at least 1/2 at construction loan closing
>    * Balance pro-rated over Construction Period if on
>      time and budget
>
>    * This can be flexible
>
> 3. 2% of Net Profits at sale
>
> 4. Guaranteed minimum of $75,000 1st year
>
> 5. Start date June 1, 1997

If this document is acceptable, please sign where indicated below.

Armand, we look forward to a long and successful relationship together.

The letter was on the stationery of Cullom Properties, Inc., but was signed by Baron Corporation by way of its president, Cullom. Below Cullom's signature is that of Salvatore. The latter's signature assents that the terms of the letter are "[a]greed to and accepted this 13 day of May, 1997." A copy of this letter agreement is attached as an Appendix to this opinion. As can be seen, Salvatore's employment was to start on June 1, 1997.

During his employment with Baron, Salvatore managed several commercial developments, *i.e.*, strip malls consisting of anchor stores and smaller stores leased or sold to retailers and out-parcels retained by the defendants. Generally speaking, the construction fees and sales commissions that were due on a given project were paid by the limited partnership associated with that project. A recitation of background information regarding these projects is necessary to flesh out the issues raised on this appeal.

B.

*1. The Lenoir City Project*

The Lenoir City project was already underway when Salvatore was first employed by Baron. Despite the fact the project was already substantially completed when Salvatore commenced his employment, Baron and the Lenoir City limited partnership[1] paid him a construction fee based upon the entirety of the development. At the time of his termination, the anchor parcel had a sales contract pending. However, the sale was not closed until several months after Salvatore was terminated. This sale resulted in a profit of $201,634. Salvatore received no commission in connection with this sale. One of the out-parcels was sold for cash before his termination. Again, despite Salvatore's limited contributions to the project, the Lenoir City limited partnership paid him a commission based on profit realized from this sale. While he was still working for Baron, another out-parcel was traded between the two Lenoir City limited partners. No cash was exchanged, and Salvatore was not paid a commission arising from this transfer. A CPA testified that the swap ultimately resulted in a profit of $1,030,498.

*2. The Brighton, Michigan Project*

Salvatore was paid all but $500 of the construction fee due him on this project. The Brighton limited partnership retained the property; hence, Salvatore was not due a sales commission on this

---

[1]The record reflects that at some unspecified point in time, the Lenoir City limited partnership was converted into a general partnership. This fact is not pertinent to the instant case. For ease of reference, we will refer to the entity involved in the Lenoir City development as a limited partnership.

development.  Salvatore testified that, under a separate contract, he was promised $5,000 for what were apparently extraordinary tasks on this project.  He admitted at trial that he had received this compensation by way of two payments of $2,500 each.

### *3. The Lebanon, Ohio Project*

Salvatore was paid a construction fee on this project.  However, the limited partnership entered into a 25-year lease for the anchor parcel in the development and retained title to the property.  One out-parcel was retained by the limited partnership and another was sold at a net loss. Salvatore realized no commissions on this project.

### *4. The Morristown Project*

Salvatore was terminated when this project was 90% complete.  He had already received a fee of $15,000 for the project, but testified that he was still owed another $10,000.  It is unclear whether the $10,000 includes monies due with respect to the 10% of the project that was unfinished at the time of his termination.  As in the case of the Lebanon project, the limited partnership retained title to the anchor property. In 1999, after Salvatore's termination, the defendant leased the property and then sold that lease to a third party, realizing a $485,545 profit with respect to that tract. Salvatore received no commissions on this project.

### *5. The Bristol Project*

The record is somewhat sparse regarding the Bristol project.  There is no indication as to whether Salvatore received a construction fee for the project or to what extent he oversaw its completion.  The record reflects that the defendant realized profits of $1,616,610 from sales in this development; however, this did not occur until November, 2000, well after Salvatore's tenure with Baron had ended.

### *6. The Knox County Project*

The Knox County project differed from the others in that the defendant Cullom Properties, Inc., was under contract with a third party to develop that party's property.  For this, the corporation was to be paid a flat fee of $200,000. Salvatore testified that, by way of a collateral contract, he was to be paid $25,000.  This particular contract was allegedly entered into with defendant Cullom Properties, Inc.  There is some contradictory testimony as to whether the $25,000 sum included the $5,000 amount due for the additional work on the Brighton project.

### C.

Salvatore worked for Baron from June 1, 1997, until his termination on December 17, 1998. Prior to Salvatore's termination, Baron made Salvatore aware that it was planning to scale back its work and that it would no longer need his services effective on or about the end of calendar year

1998. In December 1998, Cullom, as the principal of Baron, presented Salvatore with a proposal to settle accounts between the parties. When Salvatore refused to agree to the terms of the proposed settlement, which evidently did not include any monies for the collateral contracts, Cullom immediately terminated him.

## II.

### A.

Salvatore contends that the trial court erred when it failed to award him damages beyond his base salary for the period from the date of termination to May 30, 1999, the end date of Salvatore's second year of employment. He asserts that his employment with the defendants was pursuant to a four-year contract. In the alternative, he claims that, at the very least, he had a one-year contract with the defendants that renewed automatically on a year-to-year basis. Salvatore asserts that he is owed for unpaid construction fees accruing before his termination; an unpaid commission for a sale negotiated before his termination, but not closed until after his termination; sales commissions relating to the sale of projects he had worked on prior to his termination; and sales commissions for property disposed of in ways not expressly contemplated by his employment contract. Additionally, Salvatore seeks treble damages against defendant Cullom personally, pursuant to Tenn. Code Ann. § 47-50-109 (2001).

### B.

The defendants contend that the trial court erred by awarding Salvatore salary for approximately five months following his termination. Additionally, the defendants contend that the court below properly refused to award Salvatore any of the contingent compensation he seeks. They also argue that the trial court was correct in denying his request for treble damages against the defendant Cullom.

## III.

This is a non-jury case. As mandated by Tenn. R. App. P. 13(d), there is a presumption that the trial court's findings of fact are correct. Accordingly, we must honor that presumption unless the evidence preponderates to the contrary. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

Following the trial, Salvatore moved the trial court to make additional findings of fact which the court declined to do.[2] When a trial court makes no findings of fact, we must determine the preponderance of the evidence *de novo* with no presumption of correctness, because there are no

---

[2] In fairness to the chancellor, Salvatore's request came on to be heard several months after the trial, at a time when the chancellor's recollection of the evidence had dimmed.

findings to which such a presumption can attach. *See* ***Ganzevoort v. Russell***, 949 S.W.2d 293, 296 (Tenn. 1997).

We review a trial court's conclusions of law *de novo* with no presumption of correctness. ***Campbell v. Florida Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996).

IV.

It is important to note that "[t]he interpretation of a written agreement is a matter of law and not of fact." ***Rainey v. Stansell***, 836 S.W.2d 117, 118 (Tenn. Ct. App. 1992) (citation omitted); *see also* ***Eyring v. East Tennessee Baptist Hosp.***, 950 S.W.2d 354, 358 (Tenn. Ct. App. 1997). "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention consistent with legal principles." ***Rainey***, 836 S.W.2d at 118. The court will look to the material contained within the four corners of the instrument to ascertain its meaning as an expression of the parties' intent. ***Simonton v. Huff***, 60 S.W.3d 820, 825 (Tenn. Ct. App. 2000). The words of the contract should be given their usual, natural and ordinary meaning. ***Id***. "All provisions of a contract should be construed as in harmony with each other, if such construction can be reasonably made, so as to avoid repugnancy between the several provisions of a single contract." ***Rainey***, 836 S.W.2d at 119. Pursuant to the rule of practical construction, "the interpretation placed upon a contract by the parties thereto, as shown by their acts, will be adopted by the court . . . ." ***Hamblen County v. City of Morristown***, 656 S.W.2d 331, 335 (Tenn. 1983) (citations omitted), *quoted in* ***Brandt v. Bib Enters., Ltd.***, 986 S.W.2d 586, 593 (Tenn. Ct. App. 1998).

The law allows for treble damages for interference with contract. Tenn. Code Ann. § 47-50-109 provides as follows:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

This court has interpreted the statute as follows:

> Under Tennessee law, there are seven elements to an action for inducement to breach a contract, both at common law and under T.C.A. § 47-50-109.... The plaintiff must prove: (1) that there was a legal contract; (2) that the wrongdoer had sufficient knowledge of the contract; (3) that the wrongdoer intended to induce its breach; (4) that the wrongdoer acted maliciously; (5) that the contract was breached;

(6) that the act complained of was the proximate cause of the breach;
and (7) that damages resulted from the breach.

*TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987).

V.

A.

The first issue that we must address is whether the contract between Salvatore and Baron is a contract for a fixed term. As previously mentioned, Salvatore contends that he had either a four-year contract or, in the alternative, a one-year contract that was automatically renewed on June 1, 1998, when he continued to work after that date. On the other hand, the defendants contend that the initial contract provided for a bi-monthly term of employment or, in the alternative, that the contract expired after one year, if not earlier, and that it did not renew after its expiration.

1.

As a preliminary matter, we hold that Salvatore's contract clearly was not a four-year contract. The only "evidence" of a four-year contract is found in conversations that allegedly took place between Salvatore and Cullom. On its face, the letter employment agreement does not provide, expressly or by implication, for a four-year term. Furthermore, the thrust of the subject conversations is nothing more than a statement of aspirational goals for Salvatore's employment. We find no evidence of a guarantee of a four-year term. The only periods of time mentioned in the document are bi-monthly and one year. We hold that Salvatore is incorrect in his assertion that he had an employment contract for a four-year term.

2.

The trial court found the contract to be for a fixed period of one year. We agree. It is well settled law in Tennessee that a contract providing for payment of compensation for a term is a contract for that period of time unless other evidence shows the contract to be for another specific period of time. *Delzell v. Pope*, 200 Tenn. 641, 651, 294 S.W.2d 690, 694 (1956); *Ball v. Overton Square, Inc.*, 731 S.W.2d 536, 538 (Tenn. Ct. App. 1987); *Ward v. Berry & Assocs., Inc.*, 614 S.W.2d 372, 376 (Tenn. Ct. App. 1981). In the instant case, although Salvatore was to be paid on a bi-monthly basis, his salary guarantee was stated with reference to a year. Therefore, the contract created employment for one year. *Cf.*, *Ward*, 614 S.W.2d at 376 (explaining that the statement, "'you should earn a bonus the first year'" indicated an intent to hire for a full year; in the present case, the contract contains a guaranteed minimum first year salary that we find analogous to the *Ward* bonus guarantee).

-7-

3.

Having established that the contract provided for a one-year term, our next inquiry is whether the contract renewed at the end of the first year. The Supreme Court has provided the following guidance on this issue:

> The general rule is that when, upon the expiration of a contract of employment for a definite term, the employee continues to render the same services as he rendered during the term of the contract without explicitly entering into any new agreement, it will be presumed prima facie that he is serving under a new contract having the same terms and conditions as the original one.

*Delzell*, 200 Tenn. at 650, 294 S.W.2d at 694 (citation omitted). In the instant case, the parties did enter into negotiations regarding a new employment contract. However, it is undisputed that no such contract was ever agreed to. The defendants also point to the fact that, at some point during Salvatore's employment, he asked that his compensation checks be made payable to his wholly-owned corporation. The defendants insist that this was a change in the terms of the contract; therefore, according to the defendants, the original written contract was not susceptible to being renewed after the initial first year. We do not believe that the facts relied upon by the defendants have any material bearing on the contractual relationship between these parties, nor do they overcome the presumption that the contract was automatically renewed for a second year. Therefore, we hold that Salvatore's one-year contract automatically renewed for another one-year term. Having determined that Salvatore was under contract at the time of his termination, we hold that the defendants breached this contract by prematurely terminating his employment.[3] Accordingly, we affirm the trial court's award of Salvatore's base salary for the remainder of the second year.

B.

Our inquiry now focuses on the issue of damages for fees and commissions. As the factual background laid out earlier in this opinion reflects, these elements of damages are somewhat complicated. Salvatore claims additional contract damages in two ways. First, he contends that he is due damages for unpaid fees and commissions under his employment contract. Second, he claims that some of the defendants breached collateral contracts with him as they pertain to individual projects. He also claims tort damages for interference with contract. We will first address the issue of damages arising from his employment contract.

---

[3]The defendants do not allege or attempt to prove that Salvatore's termination was for cause.

C.

1.

Salvatore contends that he is entitled to construction fees for the Brighton and Morristown projects. From the record, it is undisputed that Salvatore is due $500 from the Brighton project and that this sum has not been paid to him. We therefore find that this claim is supported by a preponderance of the evidence and that the trial court erred when it failed to award this sum. With regard to the Morristown project, Salvatore testified that at the time of his termination, his personal work was 90% complete and the project was 24% complete. Applying the rule of practical construction, we hold that the fact Salvatore was paid construction fees for a project to which he did not substantially contribute, but which was completed after he was hired, *i.e.*, the Lenoir City Project, evidences the parties' intention that Salvatore's fees are limited to projects finally closed during the period of his employment. This would exclude fees due for projects finally closed after his termination. Accordingly, we hold that Salvatore is not entitled to a fee for the Morristown Project.

2.

Salvatore also claims that he entitled to the 2% commission in connection with sales of projects to which he contributed, but which were sold subsequent to his termination. These projects include Lenoir City, Lebanon, Morristown, and Bristol. As is the case with the construction fees, the contract does not specify whether he is entitled to commissions for sales closed after his departure. As the trial court did, we find it important to note that Salvatore was paid a 2% commission in connection with a Lenoir City out-parcel sale soon after his employment commenced. As just mentioned, the record reflects that he did not contribute substantially to this project. Nonetheless, he received the 2% commission based upon the profit from this sale. As we consider this behavior indicative of the parties' intent, we hold that Salvatore is entitled only to commissions for sales closed during his tenure. Therefore, we hold that Salvatore is not entitled to the additional commissions he seeks.

3.

Salvatore also seeks his commission for "non-sale" disposals of property . As previously outlined, this claim involves the sale of the Morristown lease after his termination and the Lenoir City land swap which took place while he still worked for Baron. Though we have sufficiently dealt with the commission sought for the Morristown lease sale in the previous paragraph – as it is a profit realized after Salvatore's departure – we will discuss it here as it is instructive on this issue. We find no ambiguity in the contract regarding Salvatore's entitlement to *sales* commissions. The contract provides only for the payment of 2% of profits realized from *sales*. The contract does not contain a similar provision with respect to other methods of disposal. Salvatore asks us to apply the 2% commission to these other transactions. However, we cannot do so without fundamentally changing the contract. Awarding him 2% of the value of a lease or of a cashless land swap is not something envisioned in the contract and is not analogous to 2% of profits from *sales*. Therefore, we hold that

Salvatore is not entitled to any damages with respect to properties disposed of in ways not contemplated by the contract.

D.

The trial court made no findings regarding the collateral contracts testified to by Salvatore. As previously stated, Salvatore stated that he negotiated separate contracts on the Brighton and Knox County projects. The following testimony by Salvatore is pertinent on this issue:

> Q. Now, in connection, Mr. Salvatore, with your employment, what was the situation relative to some work that was done on Clinton Highway in Knox County?
>
> A. That project was brought to us and we were asked to basically insert ourselves as the developer of that project for a fee to take a piece of land that the Schaad family owned and assist in the planning, engineering and development of the Home Depot Shopping Center on that site.
>
> * * *
>
> Q. Well, was there ever an agreement made as to what you would be paid for that work on the Clinton Highway site?
>
> A. I remember a conversation that he agreed to the $25,000 figure. I do not remember whether the Brighton money was in that or was not in that.

This testimony was left uncontroverted by the defendants. Therefore, we find that Salvatore established the existence of the Knox County collateral contract. We find that his termination resulted in the breach of this collateral contract. As such, he is entitled to damages. With regard to the $5,000 Brighton collateral contract, as previously mentioned, Salvatore testified that he had been paid in full. Therefore, he is entitled to no further recovery for the Brighton collateral contract. Since he testified that he was not sure if the $25,000 figure was intended to include the $5,000 from the additional work done in connection with the Brighton project (that evidently had not yet been paid when the Knox County contract was negotiated), he cannot prove an entitlement to more than $20,000 in connection with the Knox County project.

E.

The trial court made a factual finding that Salvatore failed to establish that the defendant, Cullom, was guilty of intentional interference with contract. The court below did not state its reasons for reaching this conclusion. We note there must be a showing that "the wrongdoer acted

-10-

maliciously." ***TSC Indus.***, 743 S.W.2d at 173. Defendant Cullom admitted on the witness stand that he benefitted from Salvatore's termination as his corporations and partnerships then escaped liability for additional fees payable under Salvatore's employment contract. However, the cutbacks that led to Salvatore's termination had their roots in matters totally unrelated to Salvatore and his contract. Furthermore, the evidence does not indicate that the plan to "scale back operations" was motivated by a desire to avoid paying Salvatore fees and commissions. Absent such evidence, we cannot say the evidence preponderates against a finding that this cause of action was not made out by the proof. We find no proof of malice on the part of Cullom. We resolve this issue against Salvatore.

VI.

The award to Salvatore is increased by $20,500, being a $500 construction fee against Baron Corporation and CZ-Brighton Associates, L.P., in connection with the Brighton project, and a $20,000 construction fee against Cullom Properties, Inc., for the Knox County collateral contract. The judgment of the trial court, as modified, is affirmed. This case is remanded to the trial court for enforcement of that court's judgment, as modified, and for the collection of costs assessed below, all pursuant to applicable law. Exercising our discretion, we tax the costs on appeal to the appellee, Baron Corporation.

_____
CHARLES D. SUSANO, JR., JUDGE